## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE APPLICATION OF THE BRITISH
BROADCASTING CORPORATION,
ET AL., FOR ACCESS TO OPINIONS
AND ORDERS ADJUDICATING CERTAIN
ASSERTIONS OF EXECUTIVE PRIVILEGE

Case No.

Chief Judge James E. Boasberg

Case: 1:26-mc-00081
Assigned To : Boasberg, James E.
Assign. Date : 5/22/2026
Description: Misc.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE APPLICATION OF THE BRITISH BROADCASTING CORPORATION, ET AL., FOR ACCESS TO OPINIONS AND ORDERS ADJUDICATING CERTAIN ASSERTIONS OF EXECUTIVE PRIVILEGE

BALLARD SPAHR LLP

Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com

Sasha Dudding (#1735532)
1675 Broadway, 19th Floor
New York, NY 10019
Tel: (212) 223-0200
Fax: (212) 223-1942
duddings@ballardspahr.com

*Counsel for Applicants*

RECEIVED

MAY 2 2 2026

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

ii

**PRELIMINARY STATEMENT**

In this Application, the British Broadcasting Corporation ("the BBC"), BBC Studios Distribution Ltd., and BBC Studios Productions Ltd., (together, the "Applicants") respectfully seek to further unseal the opinions and orders issued in this District adjudicating assertions of executive privilege that President Donald Trump made, or directed others to make, in connection with the Special Counsel's investigation into the 2020 presidential election (the "Executive Privilege Decisions"). Unsealing is justified under Rule 6(e) of the Federal Rules of Criminal Procedure because the Applicants seek disclosure "in connection with a judicial proceeding." The First Amendment right of access also supports further unsealing these important decisions.

President Trump is currently suing the BBC, the United Kingdom's main public service provider of news and entertainment media, and its co-Applicants in federal court in Florida over a documentary (the "Documentary") that the BBC aired in 2024. The Documentary sought to explain President Trump's continued success with his loyal American voters to U.K. viewers, but President Trump claims that it defamed him by editing together parts of a speech that he delivered to a "Stop the Steal" rally at the White House Ellipse on January 6, 2021. According to President Trump, this edit conveyed the allegedly false implication that he incited the riot and assault on the U.S. Capitol that followed his speech.

Because President Trump is a public official and the speech at issue in his lawsuit against the Applicants relates to a matter of public concern, President Trump must prove that any statement or implication he challenges is materially false. The Applicants have therefore propounded to President Trump discovery requests that call for information and records concerning his communications with officials, advisors, and allies in connection with the "Stop the Steal" movement and his January 6 speech, as those communications would shed light on President Trump's intent and state of mind in delivering that speech. President Trump has

1

responded by asserting, *inter alia*, that the requested information and records are shielded from disclosure by executive privilege.

As this Court is aware, President Trump previously asserted or directed others to assert executive privilege in connection with the Special Counsel's investigation into the 2020 presidential election, and then-Chief Judge Beryl Howell considered and rejected those assertions of the privilege as to 14 witnesses across five sealed proceedings. *In re New York Times Co.*, 2025 WL 1905544, at *1 (D.D.C. July 10, 2025). These Executive Privilege Decisions were previously released in part, *see id.*, but they remain too heavily redacted to inform the Applicants or the Florida federal court as to which communications were at issue and why the assertions of executive privilege over those communications failed.

Rule 6(e) permits disclosure of the opinions and orders in precisely these circumstances. **First**, further unsealing "is needed to avoid a possible injustice in another judicial proceeding," *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979), because President Trump is asserting executive privilege in his case against the Applicants even though he may be barred from doing so. **Second**, "the need for disclosure is greater than the need for continued secrecy," *id.*, because President Trump's assertion of executive privilege, if barred, is wrongly impeding the Applicants from obtaining records highly relevant to President Trump's claims, while the investigations that gave rise to these ancillary proceedings have concluded. **Third**, this "request is structured to cover only material so needed," *id.*, because the Applicants seek only the opinions and orders adjudicating assertions of executive privilege over what appear to be the same communications that the Applicants have sought in discovery. Moreover, the First Amendment right of access provides another basis to further unseal these rulings, and the government cannot carry its burden under that right of access to justify the current redactions.

2

For all these reasons, and those below, the Court should grant this application and further unseal the opinions and orders adjudicating President Trump's assertions of executive privilege.

## BACKGROUND

I.    **PRESIDENT TRUMP'S PRIOR ASSERTION OF EXECUTIVE PRIVILEGE**

A.    **The 2020 Election And The January 6, 2021 Capitol Riot**

On November 3, 2020, Joseph R. Biden, Jr. was elected President of the United States. Then-President Trump, however, refused to concede, "claiming that the election was 'rigged' and characterized by 'tremendous voter fraud and irregularities.'" *Trump v. Thompson*, 20 F.4th 10, 17 (D.C. Cir. 2021). President Trump "and his allies filed a series of lawsuits challenging the results of the election. The courts rejected every one of the substantive claims of voter fraud that was raised." *Id.* (cleaned up). But, according to the final report of the House Select Committee to Investigate the January 6th Attack on the United States Capitol, President Trump "disregarded the rulings of the courts and rejected the findings and conclusions and advice from his Justice Department, his campaign experts, and his White House and Cabinet advisors," and chose "to try to overturn the election on January 6th and took a series of very specific steps to attempt to achieve that result." H.R. Rep. No. 117-663 (Dec. 22, 2022) at 28.

Those efforts came to a head on January 6, 2021, when thousands of rioters stormed the Capitol in a "blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process." *See Director Wray's Statement on Violent Activity at the U.S. Capitol Building*, FBI (Jan. 7, 2021), https://www.fbi.gov/news/press-releases/director-wrays-statement-on-violent-activity-at-the-us-capitol-building-010721. These events "marked the most significant assault on the Capitol since the War of 1812." *Trump*, 20 F.4th at 18-19.

3

## B.    The Special Counsel's Investigation

In November 2022, U.S. Attorney General Merrick Garland appointed Jack Smith as Special Counsel "to conduct the ongoing investigation into whether any person or entity violated the law in connection with efforts to interfere with the lawful transfer of power following the 2020 presidential election or the certification of the Electoral College vote held on or about January 6, 2021." *See Off. of the Att'y Gen. Order No. 5559-2022* at 1 (Nov. 18, 2022), https://www.justice.gov/d9/press-releases/attachments/2022/11/18/2022.11.18_order_5559-2022.pdf. Attorney General Garland also authorized the Special Counsel to "prosecute federal crimes arising from the investigation of these matters" and "refer to the appropriate United States Attorney discrete prosecutions that may arise from the Special Counsel's investigation." *Id.* at 2.

Two years later, the Special Counsel's investigation concluded with the release of a two-volume report, the first volume of which concerned the investigation into the 2020 election. *See Final Report on the Special Counsel's Investigation and Prosecutions: Volume I: The Election Case: Report on Efforts to Interfere with the Lawful Transfer of Power Following the 2020 Presidential Election or the Certification of the Electoral College Vote Held on January 6, 2021* (Jan. 7, 2025), https://www.justice.gov/storage/Report-of-Special-Counsel-Smith-Volume-1-January-2025.pdf (the "Smith Report"). The Special Counsel concluded that, after President Trump lost the 2020 election, "substantial evidence demonstrates that [he] then engaged in an unprecedented criminal effort to overturn the legitimate results of the election in order to retain power." Smith Report at 2.

According to the Special Counsel, "Mr. Trump's efforts to remain in power converged and culminated on January 6, the day that Mr. Biden was to be certified President." *Id.* at 23. "That day, Mr. Trump was scheduled to speak at the Ellipse to the crowd of supporters he had

summoned to Washington with false claims of election fraud." *Id.* Describing that speech, the Special Counsel wrote:

> Mr. Trump told the crowd—a crowd of his supporters that he had remarked to advisors the night before was "angry"—that the election had been stolen and the country would no longer exist if this purported crime were not stopped; and that the discovery of "fraud" licensed them to "go by very different rules." Although Mr. Trump at one point also told his supporters to "peacefully and patriotically make [their] voices heard," he used the word "fight" more than ten times in the speech before concluding by directing his supporters to march to the Capitol to give allied Members of Congress "the kind of pride and boldness they need to take back our country." He also told the angry crowd that "if you don't fight like hell, you're not going to have a country anymore."

*Id.* at 24-25. Following the speech, "[a]t Mr. Trump's urging, thousands of his supporters marched from the Ellipse to the Capitol building." *Id.* at 25. There, "[o]utside the building, the crowd swelled and broke through barriers cordoning off the grounds," and "the crowd violently attacked the law enforcement officers attempting to secure the building." *Id.* President Trump himself returned to the White House, where his advisors "forcefully urged [him] to issue calming messages to his supporters." *Id.* at 29. President Trump "resisted" these calls, "repeatedly remarking that the people at the Capitol were angry because the election had been stolen." *Id.*

Based on this investigation, the Special Counsel was "prepared to prove that Mr. Trump willfully caused his supporters to obstruct and attempt to obstruct the proceeding by summoning them to Washington, D.C., and then directing them to march to the Capitol to cause the Vice President and legislators to reject the legitimate certificates and instead rely on the fraudulent electoral certificates." *Id.* at 47. The Special Counsel further "determined that there were reasonable arguments to be made that Mr. Trump's Ellipse Speech incited the violence at the Capitol on January 6 and could satisfy the Supreme Court's standard for 'incitement' under *Brandenburg v. Ohio.*" *Id.* at 66. Indeed, though the investigation "did not develop direct

5

evidence . . . of Mr. Trump's subjective intent to cause the full scope of the violence that occurred on January 6," the Special Counsel concluded that "the evidence established that the violence was foreseeable to Mr. Trump, that he caused it, that it was beneficial to his plan to interfere with the certification, and that when it occurred, he made a conscious choice not to stop it and instead to leverage it for more delay." *Id.*

## C.    Ancillary Proceedings On Executive Privilege

In a section of the Smith Report titled "Investigative Challenges and Litigation Issues," the Special Counsel specifically discussed President Trump's assertions of executive privilege. According to the report, President Trump "asserted a form of executive privilege known as the presidential-communications privilege . . . with respect to fourteen Executive Branch officials," and these "repeated assertion of the presidential-communications privilege as a basis to withhold evidence required extensive preindictment litigation that delayed the Office's receipt of important testimony and other evidence, including testimony from senior White House staff and Executive Branch officials." *Id.* at 116.

The report states that "[t]he courts uniformly rejected Mr. Trump's privilege assertions seeking to deny the grand jury from hearing evidence from Executive Branch employees." *Id.* Quoting from these rulings, the report states that "in each instance, the courts determined that the 'importance and unavailability' of that 'vital' evidence 'outweigh[ed]' the qualified privilege for presidential communications and ordered that it be produced promptly to the grand jury." *Id.* at 117 (alteration in original). In another such proceeding, "[t]he court found that the witnesses possessed unique and inimitable evidence, that was important and relevant to the grand jury's investigation," such that its "importance and unavailability . . . outweigh the presidential-communications privilege in this case." *Id.* at 120 (cleaned up). Likewise, the district court

6

found that executive privilege was overcome when "the Government filed two more motions to compel testimony from three additional witnesses." *Id.* at 121.

Finally, the report states that the Special Counsel's Office "decided to consolidate the proceedings to the extent possible and filed two additional motions to compel that covered the remaining eight Executive Branch officials who had communicated through their attorneys that they would withhold testimony from the grand jury based on executive privilege," and that the court granted these motions as well, "making findings with respect to each individual witness that . . . they possessed vital evidence for the grand jury, the importance and unavailability of which outweighed the presidential communications privilege." *Id.* (cleaned up).

**D.    The Partial Unsealing Of The Executive Privilege Decisions**

In 2022, based on reporting that President Trump's assertions of executive privilege were the subject of ancillary litigation in this District, Politico and The New York Times submitted applications for access to the records of those proceedings. Then-Chief Judge Howell denied those applications, but in doing so recognized that "[t]he sealing of judicial decisions and ancillary judicial records relied on to resolve matters pending before the Court is anathema, 'reflecting the antipathy of a democratic country to the notion of "secret law," inaccessible to those who are governed by that law.'" *In re New York Times Co.*, 657 F. Supp. 3d 136, 139 (D.D.C. 2023) (quoting *Leopold v. United States*, 964 F.3d 1121, 1127 (D.C. Cir. 2020)).

Politico appealed, and because the Special Counsel's Office subsequently "revealed for the first time that executive-privilege disputes occurred during the grand jury's investigation," the D.C. Circuit vacated and remanded for reconsideration in light of that disclosure. *In re Cheney*, 2024 WL 1739096, at *1 (D.C. Cir. Apr. 23, 2024) (per curiam). On remand, the government agreed to partly release the Executive Privilege Decisions, and it publicly filed 18

7

redacted documents, which "represent this Court's and its predecessor's rulings on the parties'

motions to compel and motions to stay pending appeal in the five executive-privilege

proceedings, including the orders, memorandum opinions, and oral rulings associated with those

holdings." *In re New York Times Co.*, 2025 WL 1905544, at *1. This Court then concluded that

these redacted copies of the Executive Privilege Decisions were all it could make public under

Local Criminal Rule 6.1 as information for which "continued secrecy is not necessary to prevent

disclosure of matters occurring before the grand jury," *id.* at *2 (quoting L. Crim. R. 6.1), and

that the First Amendment right of access did not justify any additional disclosures, *id.* at *3.

## II.    PRESIDENT TRUMP'S CURRENT ASSERTION OF EXECUTIVE PRIVILEGE

On October 28, 2024, the BBC aired the Documentary – titled *"Trump: A Second

Chance?"* – in its long-running current affairs program *Panorama*. Around three minutes of the

hour-long Documentary depicted the events of January 6, 2021, including a 12-second cut of

President Trump's speech at the Ellipse, followed by the violent attacks on the Capitol.

On November 9, 2025, President Trump, through counsel, wrote to the BBC, arguing that

the Documentary's edit of his January 6 speech defamed him and threatening a $1 billion suit.

*See* Compl. ¶ 46 & Ex. A, *Trump v. BBC*, No. 1:25-cv-25894-RKA (S.D. Fla.) (ECF 1). Despite

receiving a retraction and apology as he demanded, on December 15, 2025, President Trump

followed up on that threat and sued the Applicants, alleging that the manner in which the

Documentary edited his speech defamed him and violated the Florida Deceptive and Unfair

Trade Practices Act, causing "direct harm to his professional and occupational interests," and

demanding $5 billion in damages in each count of the Complaint. *Id.* ¶¶ 101, 104-19, pp. 31-32.

The Applicants and President Trump have exchanged discovery requests and responses

while the Applicants' motion to dismiss for lack of personal jurisdiction and failure to state a

8

claim remains pending. Because President Trump alleges, *inter alia*, that the edit of his speech conveys a "false, malicious, and defamatory message that President Trump fomented violence, which he did not," *see id.* ¶ 44, the Applicants have propounded discovery requests on President Trump seeking information about and copies of his communications related to his January 6 speech. For example, the Applicants requested copies of communications and other documents related to January 6 that President Trump provided to Special Counsel Smith.[1] Because that material could shed light on President Trump's knowledge, intent, and state of mind in delivering his January 6 speech, the requested material is highly relevant to an essential element of President Trump's claims: that the purported implication that the Documentary allegedly conveyed was materially false. *See, e.g.*, *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) (defamation requires falsity); *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006) (FDUPTA violation requires "a deceptive act or unfair practice"). President Trump has responded to several of these discovery requests by objecting and asserting, *inter alia*, executive privilege, and he has maintained those objections even after the Applicants' counsel conferred with his counsel and conveyed that the Executive Privilege Decisions may estop or preclude his assertion of this privilege.

---

[1] In another request for production to which President Trump objects based on executive privilege, the Applicants seek:

> All Documents and Communications Concerning the "Stop the Steal" rally on January 6, 2021 and the speeches given at that event, including Your speech. For the avoidance of doubt, this includes planning the "Stop the Steal" rally and Your speech, and includes all Communications with any of the following persons: Stephen Bannon; Christina Bobb; Jeffrey Clark; John Eastman; Boris Epshteyn; Michael Flynn; Rudy Giuliani; Preston Haliburton; Bernard Kerik; William Ligon; Ed McBroom; Stephen Miller; Russell Ramsland; Roger Stone; Phil Waldron; and Kelli Ward, as well as all drafts of Your January 6, 2021 speech and all Communications about those drafts.

9

## ARGUMENT

For two separate and independent reasons, the Court can and should further unseal the Executive Privilege Decisions. **First**, Rule 6(e) expressly permits such disclosure "in connection with a judicial proceeding," and the Applicants seek these records directly in connection with President Trump's lawsuit. **Second**, the constitutional right of access to judicial records applies to court opinions and orders, and the government cannot demonstrate that partially sealing those records here is essential to preserve higher values and is narrowly tailored to serve that interest.

## I. THE COURT SHOULD UNSEAL THE EXECUTIVE PRIVILEGE DECISIONS PURSUANT TO RULE 6(e)(3)(E)(i)

Rule 6(e)(3)(E)(i) provides that "[t]he court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter . . . preliminarily to or in connection with a judicial proceeding." The Supreme Court has articulated a three-part test for when such a disclosure is justified under this rule: parties seeking access "must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil*, 441 U.S. at 222; *see also Doe v. Cabrera*, 126 F. Supp. 3d 160, 163 (D.D.C. 2015) (applying *Douglas Oil* test and granting access); *Doe v. Roe*, 2021 WL 9909349, at *1 (D.D.C. Feb. 3, 2021) (same).

The Supreme Court has recognized "the considered discretion of the district court to determine the proper response to requests for disclosure under Rule 6(e)." *Douglas Oil*, 441 U.S. at 228. Here, based on a straightforward application of the three-part *Douglas Oil* test, this Court should exercise its discretion to grant the Applicants' request for access.

10

### A.    Disclosure Will Avoid A Possible Injustice

This request satisfies the first *Douglas Oil* element because granting access to the Executive Privilege Decisions is necessary to avoid the possible injustice of President Trump asserting executive privilege in his litigation against the Applicants even where that assertion of the privilege should be estopped or precluded. *See, e.g., Herrera v. Wyoming*, 587 U.S. 329, 342 (2019) ("Under the doctrine of issue preclusion, a prior judgment forecloses successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." (cleaned up)). Thus, to the extent this Court has ruled that President Trump cannot shield certain records and information pursuant to the executive privilege yet he proceeds to withhold them as privileged in the Florida lawsuit despite that ruling, and the Applicants are unable to show that this claim of privilege is barred, the Applicants would be significantly prejudiced.[2]

### B.    The Need For Disclosure Outweighs Any Need For Secrecy

The Applicants also satisfy the second *Douglas Oil* element because their need for access to the Executive Privilege Decisions outweighs any interest in their continued sealing. The Executive Privilege Decisions are central to the Applicants' ability to assess whether President Trump is improperly withholding records and information that have been adjudicated as not privileged. Those withheld materials are, in turn, central to the Applicants' defenses to the defamation and FDUTPA claims against them. For example, if the requested documents showed that President Trump did in fact intend to exhort the crowd to violence on January 6, he would be

---

[2] The risk of prejudice to the Applicants is heightened by the fact that President Trump's counsel has represented during meet-and-confer discussions that they do not intend to treat the Executive Privilege Decisions as binding in the Florida courts, and therefore may be withholding documents or information already found not to be privileged.

11

unable to carry his burden to establish the falsity of the implication he claims the Documentary conveyed, which is that he "fomented violence." *See* Compl. ¶ 44, *Trump v. BBC*; *cf. Blassingame v. Trump*, 87 F.4th 1, 4 (D.C. Cir. 2023) ("According to the plaintiffs," a group of Capitol Police officers, "President Trump's actions, including ultimately his speech on January 6, sparked the ensuing riot at the Capitol."). If President Trump improperly withholds documents reflecting his intent on January 6, therefore, the Applicants will be prejudiced in their defense of the defamation case.

On the other side of the scale, the interests in continued grand jury secrecy are "reduced" where, as here, the "grand jury has ended its activities." *Douglas Oil*, 441 U.S. at 222 & n.13. Moreover, the amount of information about the Executive Privilege Decisions already placed in the public domain by the Court and the government "materially alters the legal landscape in this case" and weakens any claim that continued secrecy is required. *In re Cheney*, 2024 WL 1739096, at *4 (citing "[t]he Office of Special Counsel's intervening public disclosure that privilege disputes arose before the grand jury"); *see also In re New York Times Co.*, 2025 WL 1905544, at *4 ("Trump's actions and the subjects of the grand jury's investigation are by now widely known, having been the subject of an indictment and multiple appeals."). The interests in continued sealing are also diminished because "the target . . . in the grand jury investigation" already possesses the requested records. *Douglas Oil*, 441 U.S. at 222 n.13. The second *Douglas Oil* factor therefore favors granting the BBC's application as well.

### C.    This Request Is Properly Narrowed

Finally, the Applicants' unsealing request is targeted only to those records that the Applicants need in order to properly defend the Florida case against them. This is not a case where the party seeking disclosure has made a request with a "sweeping scope," *see In re*

*Capitol Breach Grand Jury Investigations Within D.C.*, 339 F.R.D. 1, 28 (D.D.C. 2021), or one where the party seeking disclosure makes a blanket request for "all material—regardless of subject matter—that [others] provided the grand jury," *see In re Smith*, 2025 WL 843279, at *7 (D.D.C. Mar. 18, 2025). Instead, the Applicants only seek further unsealed copies of a defined set of Executive Privilege Decisions, the 18 judicial records that "represent this Court's and its predecessor's rulings on the parties' motions to compel and motions to stay pending appeal in the five executive-privilege proceedings, including the orders, memorandum opinions, and oral rulings associated with those holdings." *In re New York Times Co.*, 2025 WL 1905544, at *1. Those few records are the ones that will inform the Applicants and the Florida federal court whether President Trump is asserting executive privilege in circumstances where he should be barred from doing so. This request therefore satisfies the third and final element of *Douglas Oil*, and the Court should grant the Applicants' application accordingly.

## II. ALTERNATELY AND ADDITIONALLY, THE COURT SHOULD RELEASE THE REQUESTED RECORDS PURSUANT TO THE FIRST AMENDMENT RIGHT OF ACCESS

This Court should release the Executive Privilege Decisions for the additional and independent reason that opinions and orders are subject to the First Amendment right of access and the government cannot carry the heavy burden to justify the current extensive redactions.[3]

### A. The First Amendment Right Of Access Applies To Opinions And Orders

In *Richmond Newspapers v. Virginia*, the Supreme Court recognized that "the right to attend criminal trials is implicit in the guarantees of the First Amendment," as "without the freedom to attend such trials, which people have exercised for centuries, important aspects of

---

[3] Recognizing this Court's prior rulings on this issue, *see, e.g., In re New York Times Co.*, 2025 WL 1905544, at *3, the Applicants make this First Amendment argument in part to preserve it.

13

freedom of speech and 'of the press could be eviscerated.'" 448 U.S. 555, 580 (1980) (quoting

*Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)). The Supreme Court and lower courts have since

then identified additional categories of proceedings and records to which the constitutional right

of access attaches, and "sketched a two-stage process for resolving whether the First Amendment

affords the public access to a particular judicial record or proceeding." *Dhiab v. Trump*, 852

F.3d 1087, 1102 (D.C. Cir. 2017) (Williams, J., concurring).

"First the court must determine whether a 'qualified First Amendment right of public

access' exists." *Id.* To make that determination, "the Supreme Court has identified two

requirements that it calls the tests of experience and logic. The experience inquiry looks to

whether the proceeding has historically been open. And the somewhat oddly-labeled logic

inquiry asks whether the right of access plays an essential role in the proper functioning of the

judicial process and the government as a whole." *Id.* at 1103 (cleaned up) (citing *Press-Enter.*

*Co. v. Super. Ct.* ("*Press-Enterprise II*"), 478 U.S. 1, 9 (1986) and *In re Reporters Comm. for*

*Freedom of the Press*, 773 F.2d 1325, 1331-32 (D.C. Cir. 1985)). "Both tests must be satisfied

before we can conclude that the First Amendment provides a qualified right of access." *Id.* If

the right of access applies, then the records or proceedings "may be sealed but only if 'specific,

on the record findings are made demonstrating that closure is essential to preserve higher values

and is narrowly tailored to serve that interest.'" *Id.* at 1092 (quoting *Press-Enterprise II*, 478

U.S. at 13-14).

Both experience and logic favor access to court opinions and orders. In terms of

experience, there is perhaps no type of judicial record more firmly established in our common

law system as traditionally available to the public than court orders and decisions. As the

Supreme Court explained more than a century ago, "The whole work done by the judges

14

constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a constitution or a statute." *Banks v. Manchester*, 128 U.S. 244, 253 (1888). Put another way:

> As ours is a common-law system based on the "directive force" of precedents, its effective and efficient functioning demands wide dissemination of judicial decisions. . . . Even that part of the law which consists of codified statutes is incomplete without the accompanying body of judicial decisions construing the statutes. Accordingly, under our system of jurisprudence the judiciary has the duty of publishing and disseminating its decisions.

*Lowenschuss v. W. Publ'g*, 542 F.2d 180, 185 (3d Cir. 1976); *see also Union Oil v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) ("[I]t should go without saying that the judge's opinions and orders belong in the public domain."); *PepsiCo v. Redmond*, 46 F.3d 29, 31 (7th Cir. 1995) ("Opinions are not the litigants' property. They belong to the public, which underwrites the judicial system that produces them.").

In terms of logic, it is likewise hard to overstate the importance of access to opinions and orders. Such decisions *are* the law, and in our common law system each ruling contributes to a body of precedent that has historically recognized the vital importance of public access:

> The decisions and opinions of the justices are the authorized expositions and interpretations of the laws, which are binding upon all the citizens. They declare the unwritten law, and construe and declare the meaning of the statutes. Every citizen is presumed to know the law thus declared, and it needs no argument to show that justice requires that all should have free access to the opinions, and that it is against sound public policy to prevent this, or to suppress and keep from the earliest knowledge of the public the statutes, or the decisions and opinions of the justices. Such opinions stand, upon principle, on substantially the same footing as the statutes enacted by the legislature. It can hardly be contended that it would be within the constitutional power of the legislature to enact that the statutes and opinions should not be made known to the public.

*Nash v. Lathrop*, 6 N.E. 559, 560 (Mass. 1886); *accord Torres v. INS*, 144 F.3d 472, 474 (7th Cir. 1998) ("The idea of secret laws is repugnant. People cannot comply with laws the existence of which is concealed."). Moreover, access to opinions and orders promotes public confidence in and supervision of the courts. *See, e.g., Doe v. Pub. Citizen*, 749 F.3d 246, 267 (4th Cir. 2014) ("Without access to judicial opinions, public oversight of the courts, including the processes and the outcomes they produce, would be impossible."); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975) (interpreting FOIA to require "disclosure of all opinions and interpretations which embody the agency's effective law and policy," consistent with "congressional aversion to secret agency law" and "an affirmative congressional purpose to require disclosure of documents which have the force and effect of law" (cleaned up)).

Public access to judicial opinions and orders thus passes the tests of both experience and logic, and the First Amendment right of access applies accordingly.

### B. The First Amendment Right Of Access To Opinions And Orders Applies Even In The Context Of Ancillary Proceedings

The government may argue that even if the First Amendment right of access applies to court opinions and orders generally, it does not apply to opinions and orders issued in ancillary proceedings, and to be sure the government could cite the D.C. Circuit's statement that "[a]lthough public access plays an important role in other aspects of the judicial process, 'there is no First Amendment right of access to grand jury proceedings,' nor do First Amendment protections extend to ancillary materials dealing with grand jury matters, such as [a] concurring opinion." *In re Grand Jury Subpoena, Judith Miller* ("*In re Judith Miller II*"), 493 F.3d 152, 154 (D.C. Cir. 2007) (quoting *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 502 (D.C. Cir. 1998)). But this Court should reject that argument, just as the Supreme Court rejected an

16

analogous approach to analyzing the scope of the constitutional right of access in *Globe Newspaper v. Superior Court*, 457 U.S. 596 (1982).

There, the Commonwealth of Massachusetts argued that although there is a right of access to criminal trials, that right should not extend to criminal trials specifically involving sex crimes against minors, because "criminal trials have not always been open to the press and general public during the testimony of minor sex victims." 457 U.S. at 605 n.13. As the Court explained, it had already "discerned a First Amendment right of access to criminal trials based in part on the recognition that as a general matter criminal trials have long been presumptively open." *Id.* The question of whether the right applies to "any particular criminal trial, such as a murder trial . . . or a rape trial" did not depend on "the historical openness of *that type* of criminal trial." *Id.* (emphasis added); *accord Dhiab*, 852 F.3d at 1104-05 (Williams, J., concurring) (discussing *Globe Newspaper* and noting that "the Court applied its experience-and-logic tests to criminal trials generally, rejecting the state's effort to make the classification at the level of the testimony in question – that of a minor child in a sexual abuse case").

Just as in *Globe Newspaper*, therefore, where the Supreme Court decided that the proper question was whether the First Amendment right of access applies to criminal trials *generally*, not to a specific type of testimony at a specific type of trial, the question before this Court is whether the right of access applies to judicial opinions and orders *generally*, not whether it applies to opinions and orders issued in specific types of proceedings, such as ancillary proceedings. Because *Dow Jones* and *Judith Miller II* did not reach that specific question, this Court should do so and, given the extensive history and compelling logic discussed above, recognize that the constitutional right of access applies to these Executive Privilege Decisions.

17

## C.    The Government Cannot Justify Continuing to Partially Withhold These Judicial Records Of Intense Public Interest And Importance

If the Court agrees that a First Amendment right of access applies to judicial opinions and orders, then to justify continuing to withhold in part the Executive Privilege Decisions at issue here, the government must demonstrate that the current extensive redactions are both "essential to preserve higher values" and "narrowly tailored to serve that interest." *Dhiab*, 852 F.3d at 1102 (Williams, J., concurring).  Specifically, to overcome the constitutional access right the government must demonstrate that:

a.    There is a substantial probability of prejudice to a compelling interest if the right is not limited. *Press-Enterprise II*, 478 U.S. at 13-14; *Press-Enter. Co. v. Super. Ct.* (*"Press-Enterprise I"*), 464 U.S. 501, 510 (1984); *Richmond Newspapers*, 448 U.S. at 580-81.

b.    There is no alternative to a limitation of the access right that will adequately protect against the threatened harm. *Press-Enterprise II*, 478 U.S. at 13-14; *Wash. Post v. Robinson*, 935 F.2d 282, 289-90 (D.C. Cir. 1991).

c.    Restricting access will effectively protect against the threatened harm. *Press-Enterprise II*, 478 U.S. at 14; *Robinson*, 935 F.2d at 291-92.

d.    The restriction on access is narrowly tailored to minimize the harm to the public's access rights. *Press-Enterprise II*, 478 U.S. at 13-14; *Robinson*, 935 F.2d at 287.

In analyzing these issues, two points bear particular emphasis.

**First**, the Supreme Court and the D.C. Circuit have consistently released opinions resolving disputes in ancillary proceedings – including opinions of major public interest – with only the narrowest of redactions, if any. *See, e.g.*, *Branzburg*, 408 U.S. 665 (arising out of journalists' motions to quash grand jury subpoenas); *In re Grand Jury Subpoena, Judith Miller* (*"In re Judith Miller I"*), 438 F.3d 1141 (D.C. Cir. 2006) (same); *In re Sealed Case No. 99-3091*, 192 F.3d 995 (D.C. Cir. 1999) (per curiam); *In re Sealed Case*, 932 F.3d 915 (D.C. Cir. 2019).

18

**Second**, in deciding what if any material must be redacted to protect the secrecy of matters before the grand jury, the D.C. Circuit has instructed that "[t]here is no per se rule against disclosure of any and all information which has reached the grand jury chambers." *Senate of P.R. v. Dep't of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987). "The disclosure of information coincidentally before the grand jury which can be revealed in such a manner that its revelation would not elucidate the inner workings of the grand jury is not prohibited." *Id.* (cleaned up); *see also In re Pence*, 678 F. Supp. 3d 135, 140 (D.D.C. 2023).

With these principles in mind, this Court should conclude that the First Amendment right of access requires the more fulsome release of the Executive Privilege Decisions, with only those narrow redactions, if any, that the government can show satisfy the First Amendment standard.

## CONCLUSION

For the foregoing reasons, the Applicants respectfully request that this Court grant their application and promptly unseal to the greatest extent possible the requested judicial records.

Dated:  May 22, 2026                Respectfully submitted,

BALLARD SPAHR LLP

/s/ Charles D. Tobin
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200 | Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com

Sasha Dudding (#1735532)
1675 Broadway, 19th Floor
New York, NY 10019
Tel: (212) 223-0200 | Fax: (212) 223-1942
duddings@ballardspahr.com

*Counsel for Applicants*

19

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of May 2026, I caused true and correct copies of the foregoing to be served by email and U.S. Mail on the following:

Elizabeth J. Shapiro
Deputy Director
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Elizabeth.Shapiro@usdoj.gov


/s/ *Charles D. Tobin*
Charles D. Tobin